Good morning, Your Honors. If it may please the Court, my name is Sean Ruiz, and I represent Tokchak Kim and Tokchak Kim Investments. I am the Appellant's Counsel. In this matter, there was a business practice put in place by CB Richard Ellis Y. Inc. that they stereotyped improperly Korean businesses as running marginally authorized establishments. Tokchak Kim, as she's referred to her friends as T.C., she operated this convenience store in the Pacific Guardian Center in downtown Honolulu. She operated it for four years prior to the issues in this case developing. For four years she had paid her rent, and even though the business was not at all times exceedingly profitable, she still managed to pay her rent on time for a total period of four years. And she continued to do that, being proud, being a business owner, a small business owner in America, supporting her family. She did this, and then in light of her lease coming up for renewal, in light of the need to raise profitability for her small corporation, what she wanted to do was, based on accounting principles and based on the profitability that had been realized over the last four years, she prepared, with the assistance of an individual named Vic Hajimak, she prepared a proposed business plan. And in this plan it included three years of the profits for 2000, 2001, 2002. She used these figures to, in good faith, attempt to secure a new lease with Pacific Guardian Center because in 2003 December the lease was going to be coming up. At no point in this case did C.B. Richard Ellis Hawaii ever notify TC or Vic Hajimak that they considered Korean businesses as marginal. And if they had done that, the evidence that Vic Hajimak had, there's the deposition excerpts of TC herself, there's the deposition excerpts of Andrew Starn who was one of the representatives from Richard Ellis who was negotiating these conditions with TC and with Vic Hajimak. And at no point did he ever express that he considered her business marginal. He continued to negotiate with her. What did he do or did the defendant do through its agents to interfere with her renewing her lease or negotiating a new lease? What it shows is that she needed six months because of the inventory, almost 200,000 in inventory, she needed six months. If the lease was not going to go through and be realized for another five years, she needed at least six months to relocate to a new establishment to not have to fire sale all the goods and lose everything that she had worked hard to invest in in the small business. And when you look at the deposition excerpt of Andrew Starn from C.B. Richard Ellis, the defendant, you see that he even acknowledged that it takes up to 180 days for these businesses to be able to relocate. He also testified that he had in fact visited 10 to 20 times TC stores itself and he was very familiar with it. He said that no one could just take so much inventory and just leave on short notice that they would need up to 180 days. And that is what... Well, I understand her making her whatever negotiations she was wanted to make for a new lease. He considered her less valuable based on her race. That's the first thing. Well, what did he do? I don't know what he considered. I'm not a mind reader and there's with that except this marginal adjective that was used in some kind of a stereotypical way. But what did he do to interfere with her business? The deposition excerpt of Andrew Starn indicates that he never told TC that he was negotiating with other businesses at the same time as her. Chitchat and other, I might remark, Caucasian businesses. If you look at the businesses in the emails of Andrew Starn, they're all Caucasian businesses that he was dealing with in the names. And he never informed her that he was negotiating with these other businesses in his deposition. And that's what she needed in order to have time to relocate if the five-year renewal was not going to be realized. What's the problem with that? I mean, as the Hawaii Intermediate Court said, I mean, they had absolute right that lease was up. Lease is up. I mean, there's no further obligation on the lease. And I mean, no landlord in his right mind is going to sit back and do nothing when the current tenant is saying, I can't afford this. Well, she didn't say she cannot afford it. She said that it's not profitable enough and that she wants to remain another five years at the property and increase the profitability where it's more profitable. Well, and they made an offer, right? But they decided to relegate her to the back of the area. When you look at the proposed office T.C. wanted the area closest to Queen Street, which is where all the traffic from passerbys would see her store and be able to come in. They wanted her to take a relegation to the backspace that had a big pillar in front of it where no one would be able to see. And that's in her deposition that she declined that backspace because of it was hidden, it wasn't in well sight, and it would have actually even reduced her profitability even more because of the relegation of where it was and that's exactly what a racial stereotype is all about. You're relegating someone to lesser services based on a prohibited status such as race. So she's asking for the front by Queen Street and because they feel that she runs a marginalized store, they're offering her basically like an African American getting on the bus and being told go to the back of the bus. They're telling her go to the back of the establishment in this area where you have this much office space and you can take this back part where no one really is going to see you and that's what you can have to try to make a living. That's where the stereotypic, this is a, and with the court's question, this is like an exception to an at-will employment situation, an at-will leasing situation. You can terminate someone for cause, no cause, you can decide not to renew a lease for cause, no cause, but you cannot decide to not renew a lease based on a racial profiling and that is what is in the intent. The emails from the defendant in this case indicate in their mind they were racial profiling and making a pecking order as to who was going to be profitable and that is relegating them to a lesser service based on their race and that's where the tying comes for the racial animus and it's their own email that shows it's their policy and practice that that's how they consider the leases that they're reviewing. That's what they're doing in their mind and this isn't, this is evidence where we have objective evidence of their very intent in their own words. And whose words are you, is this PGC or Richard Ellis? Richard Ellis, your honor. This is in their very, their own words convict them of what they're doing in this case and they're profiling, it's like putting her in the back of the area where she's not going to be able to support her family and when you look at the deposition excerpt also of Mr. Moore who's attached, it also shows that he already decided there was no way he was going to lower the rent for TC and then when you compare that with the Andrew Starn deposition, it's clear that he never relayed that information to TC and when she was submitting this business plan. Are you saying she never knew that the landlord would not lower the rent? Yes, well not so much that, but she never dreamed that they would kick her out of this establishment and not operate the convenience store and when you look at the deposition excerpt of TC, that's what's indicated. She was completely shocked because she said from her business dealings and with talking with other vendors that they would continue to operate this convenience store. They have a need because it's a business establishment with many law firms in the building that they're going to have a need for a convenience store for the tenants in the building and she said that she never expected that they were going to not renew her lease that unless she had done something really bad that they would allow her to have another five years. Was she unaware that the rental rates were going up? That's not, there's no evidence in the record. You're saying she was, had no idea that they wouldn't renew the lease, but was she unconscious of the probability that there was going to be a higher rate of rent? Why had she said she couldn't afford to pay a higher rent if she didn't know that they were talking about a higher rent? No, it wasn't about higher rent, your honor. It was about actually her reducing her... Changes in the space. Yes, she wanted to reduce the space by about half and it increased the profitability. So at no point did the defendant ever express anything about raising her rent and there's nothing in the record to indicate that she was... Well, what you're suing this Richard Ellis company for is interfering with her business, her contract. What was the interference that Ellis committed? Not allowing her six months time to move into a new five-year lease. And Ellis had control over that? I thought they were just the leasing agent and they just sent the information on to PGC, which handled the negotiations. They were the ones that were withholding the information that the landlord was not interested in reducing the rent. But they had no duty right to give her that information, that's what the TC is only given her plan because she's in good faith offering this plan for them to use with her. She wasn't given... When TC submitted this plan and Vic Kajimak provided these figures, this plan was in good faith for her to remain in that establishment for five years. This was not for CB Richard Ellis to use with other potential tenants. That was never... That's the information that they withheld, that there was negotiations with others. And that's what her whole proposal was. It wasn't that she was going to leave, it was that the space was going to be reduced based on her figures. That plan was... Was there any evidence that had she continued to pay her rent and said, I'll keep the space and keep... And I like the lease the way it is and I wanted to re-up. Was there any evidence that the landlord wouldn't have done that? The landlord, yes. The landlord, when you look at the emails between the landlord, Pacific Guardian Center, and CB Richard Ellis, you see that they're already shopping around. They're directing CB Richard Ellis to already start looking for other tenants. Was that before or after she said she couldn't afford the lease the way it was currently structured? Well, she never said she couldn't afford it. It was not profitable enough. And there's a big distinction between those two, Your Honor. And that's what... Before or after she indicated that the current lease structure wasn't acceptable to her? I'm sorry, could you repeat that, Your Honor, the whole question? Was the landlord's steps to identify whether there were other potential tenants, did the landlord take those steps before or after your client said that the lease as currently structured was not acceptable to her? Well, I believe that she mentioned it was less profitable and she gave the plan in the negotiations, but she had just given this one proposal, but she had been paying the rent for four years. So there was no objective indication that she was not going to pay the rent. There was no objective evidence that Pacific Guardian Center had because she had been paying for four years. So even though she's saying that she wants to, in good faith, increase her profitability, there's no indication that she had ever at any time been unable to pay her rent. She never withheld rent until she already started to see the writing on the wall of what was going to happen. So in August, she stopped paying the rent. Was she entitled to do that under the lease? I don't think she was, Your Honor. Anything else? No, Your Honors. I'd like to reserve some time for rebuttal. May it please the Court, Mr. Luis. I am Arthur Kuohara. I represent Defendant Athlete C.B. Richard Ellis, Hawaii. Let me start off by first saying and first addressing the federal question before the Court and the violation of the section 42 U.S.C. Sections 1981 and 1982, as was discussed by Mr. Luis earlier. It appears that the appellants are making a quantum leap in concluding that the email, which innocently referred to Korean store owners as operating marginal businesses, as a racial stereotype or racial profiling. When we look at the record in this case, it is clear that there is no evidence to support any finding of any racial discriminatory intent on the part of C.B. Richard Ellis. In fact, I believe the record and the evidence suggest to the contrary. As based on the evidence, the plaintiffs or the appellants have failed to satisfy their prima facie obligation in showing that C.B. Richard Ellis intended to discriminate against Mrs. Kim and her business based on Mrs. Kim's Korean ancestry. Nor does the record show that there was any interference by C.B. possibly to negotiate a new lease with Pacific Guardian Center. In fact, the record shows that the appellants were allowed to operate their convenience store business through the expiration of their lease term on December 31, 2003. This is notwithstanding the fact, as Your Honor pointed out, that the appellants did intentionally default on their rent obligation starting from August 2003 through December 2003. The landlord, as the state court has already found, was under no duty or obligation to renegotiate a lease. The evidence, in fact, shows that after receiving the business plan, and this is the business plan which appellants are contending that was misappropriated by C.B. Richard Ellis, that business plan was delivered to its intended recipient, which would be the representatives of Pacific Guardian Center. Mr. Starn did, and Mr. Starn did not, is an agent with C.B. Richard Ellis. He provided and transmitted the business plan to the representatives of Pacific Guardian Center. Then he made a recommendation, and this is in the record, whereby on June 17, 2003, he recommended or proposed a plan in conformance with the request made by appellants that there be a space and rent reduction. That did, in fact, mean cutting down the present space in half. There's an assertion that the space was cut, it's the existing space already occupied by the appellants. So to say that they were being so-called pushed to the back of the bus, I think is inappropriate. Also, if you are familiar with the location of this convenience store, this convenience store was used primarily by and was made for the purposes of the tenants, and where the elevator shaft is in this building, it deposits the entryway is right by this convenience store. So to say that pushing them in the back of the bus would be, I believe, an inappropriate statement. On June 18, 2003, after receiving Mr. Starnes' suggestion as to how to reduce the space and rent, representatives of Pacific Guardian Center did, in fact, meet with Ms. Kim and her representatives. At that time, the proposal was made and it was rejected. C.B. Richard Ellis resigned as the exclusive listing agent for Pacific Guardian Center on June 30, 2003. Thereon, he had no more obligations or duties with Pacific Guardian Center. However, what we understand from the evidence is that Pacific Guardian Center continued to attempt to renegotiate the lease terms with Ms. Kim and her company. Ms. Kim has testified in her deposition that in August, she was shown another smaller space for her consideration, which she again rejected. Then in November, even during the time period where she was in default of her lease rent, on November 14, 2003, a letter was delivered to the appellant, which is also in the record, with another proposal, which would also extend her lease term. This is after Ellis left, though, right? This is after Ellis left, Your Honor. So, what bearing does that have on what his conduct was? Well, it just goes to show that there was never any interference on part of C.B. Richard Ellis, which would have caused Pacific Guardian Center not to negotiate, and it just shows the course of conduct of them continuing to attempt to negotiate with the appellant. What actually caused the termination of the negotiations between the appellants and Pacific Guardian Center was not the conduct of C.B. Richard Ellis, but it was, in fact, the wrongful conduct of the appellants themselves by failing to meet their rent obligations by intentionally defaulting on their monthly rental obligations starting on August 2003. By doing so, they've already put themselves in peril. Ms. Kemp admitted to her deposition that she understood by defaulting on her lease obligations, she understood that the appellant's ability to renegotiate or to renew the lease had been jeopardized. This is cited in the records 67 page 23. Likewise, she also admitted during her deposition that she had no knowledge of any facts or evidence that Richard Ellis discriminated or in any way racially discriminated against her. This, again, was in her deposition testimony. With respect to the other claims being alleged that were found in favor of C.B. Richard Ellis by the district court, the count one involves theft by deception, which we've pointed out in our answering brief, is not a civil claim, but in fact is a criminal violation under Hawaii revised statute, section 708-830. Even if assuming that the count one is for a claim of conversion, and this is a conversion of the business plan, there is no evidence to support that claim. In fact, there is no evidence to the contrary that C.B. Richard Ellis, Mr. Starn in particular, after receiving the business plan, disseminated or delivered the business plan to its intended recipient, the representatives of Pacific Guardian Center. Therefore, a summary judgment on that count was appropriate. With respect to the counts two and three of the complaint regarding C.B. Richard Ellis' use of racial stereotypes, the district court properly found that under Hawaii law, an agency relationship is required to impose such a duty of disclosure. No agency relationship existed between C.B. Richard Ellis and Tokachuk Kim and her company. C.B. Richard Ellis was the exclusive listing agent only for Pacific Guardian Center. There's a factual flaw also in that regard, where that contrary to the appellant's contention that Pacific Guardian Center did not intend to renegotiate, as we've already discussed, there was active renegotiations going starting on June 18, 2003, after the business plan was delivered by Mr. Starn to Pacific Guardian Center. Also, the issue of the, as you pointed out, Your Honor, the issue of the duty to renegotiate was, is a collateral estoppel issue, which the state court has already ruled upon that the Pacific Guardian Center did not have a duty to renegotiate a lease with its, with, with the appellants in this case. As for the claim of unfair and deceptive trade practice, count four of the complaint, we've pointed out that Tokachuk Kim Investments LLC is not a natural person under the definition of Chapter 480 to allow it to maintain this claim. Likewise, the appellant Tokachuk Kim operated a convenience store for a business purpose and not for personal family or household purposes, which is required under Chapter 480. In looking at the McElroy v. Merrill Group case, that's a case on point in here, where officers, where the court, Hawaii Court, found that officers and guarantors of a corporation which leased commercial space could not be construed as consumers under Chapter 480. Likewise, the district court properly granted summary judgment on count four. As to count nine, the duty of good faith and fair dealing, it's axiomatic that this, this claim is based on an existing contract. Well, there was no contract between appellants and C.B. Richard Ellis, so as a matter of law, this count was properly dismissed in favor of C.B. Richard Ellis. The fraud claim count... I don't believe the council's really making a push on the state law, on these state law claims. Well, that's, that's fine, Your Honor. I just don't believe that the, the comment in the email suffices to show that, to infect their conduct, and I think you probably covered that, but that seems to me to be the heart of the case. And as we covered it, there needs to be a showing of intent and also needs to be a showing of harm, and I think the, the record and evidence in this case points otherwise. If the panel has any other questions, I will address them at this time. I don't think so. Thank you very much. Thank you. Yes, Your Honors. In, in response to the Court's earlier question about withholding of the rent, that's really an issue of equity, a claim of right. When T.C. had stopped paying the rent in that August time period, at that point she was aware that she didn't have the six months to be able to relocate her inventory, and that the landlord wasn't going to be negotiating with her for the entire sale, her stuff, and if she withheld rent, it's under a claim of right, but that's really not a matter under the lease, that's really an equity claim, which is what the law allows when a dispute arises between the parties. And one thing is, the defendant claims that there's no record of any harm that the defendant in this case did, but really what they've done is they've put in motion the series of events by their racial profiling of T.C. That's what they did. They put in motion the series of events that happened, and if the Court was to analogize to 1983 civil rights actions, 1985 civil rights actions with police, when a defendant doesn't take no action or puts in motion a series of events, there can be individual liability, and that's what really happened in this case. The defendant, with its own stereotypical attitudes, racial profiling, it is the one that put in motion the series of events that caused the harm, and the harm is clear by all the deposition testimony of Andrew Starn and T.C. Other than that one email, what evidence do you have that there was any racial element of any kind in the non-negotiation or the absence of lease negotiation that caused this landlord-tenant relationship to come to an end? What evidence is there that there was any anybody cared a fig about anybody's race? It was a question of how much space was going to be available, how much rent was going to be paid. What evidence you have that anybody other than the author of that anonymous email had any racial opinions at all? You know, Your Honor, what more evidence would we need for a jury than that email? Would you actually expect that the defendants are going to admit? Don't you have to show some causal connection between that email and what happened? The causal connection is shown by the defendant's conduct when they start negotiating with Caucasian-based other establishments rather than, in good faith, with T.C. You're saying that ABC is a all over town? When you look at the names in the record, they're European names. They're not Asian names. And I think that when you look at the owners of those establishments, the court can go back and look at the record. They're Caucasian names. They're not Asian names. And they're linked to the businesses. And that's really what was at issue here is the amount of evidence that needs to be weighed when you go to a jury. And looking at an email and deciding how much evidence is weighing the evidence, and that's really a question of fact for a jury to decide. Thank you, Mr. Ruiz. Thank you, Your Honor. The matter just argued will be submitted and the court will stand adjourned. Have you guys gotten a group picture with Judge Ikuda at all? You haven't? I have a camera, that's all. Hi, sir. How are you doing? Thank you. Thank you. All done. Hey, do you want to take a picture with the judge? You don't? I asked them if I could take a picture of them with their law clerks, and they said yes.
judges: Goodwin, Rymer, Ikuta